IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARCUS J. ROSSER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. 16-381 (MN) |
| | ) |
| THOMAS DONOVAN, et al, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Marcus J. Rosser – Pro Se Plaintiff

Mary A. Jacobson, First Assistant County Attorney, NEW CASTLE COUNTY OFFICE OF LAW, New Castle, DE – Attorney for Defendants.

October 5, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

## I. INTRODUCTION

Plaintiff Marcus J. Rosser ("Plaintiff" or "Rosser"), proceeds *pro se* and has been granted leave to proceed *in forma pauperis*. (D.I. 6). He commenced this action on May 23, 2016. (D.I. 1). The Amended Complaint is the operative pleading. (D.I. 57). Plaintiff is currently housed at South Woods State Prison in South Bridgeton, New Jersey. Presently before the Court is Defendants' renewed motion for summary judgment and Plaintiff's opposition thereto. (D.I. 138, D.I. 139, D.I. 140, D.I. 141, D.I. 145, D.I. 146, D.I. 147, D.I. 148). Briefing is complete.

## II. BACKGROUND

As alleged in the Amended Complaint, on July 14, 2014, Plaintiff was stopped and taken into custody by New Castle County Detective Ellis. Plaintiff was taken to the New Castle County Police Department and, placed in a holding cell. Plaintiff asked what was going on and why he had been arrested. Plaintiff alleges that he was subjected to excessive force and that those present failed to protect him after he refused commands by Defendants. He seeks compensatory damages for physical and emotional injuries.

Defendants move for summary judgment on the grounds that they are entitled to qualified immunity because the use of force was reasonable under the circumstances; Plaintiff's allegations are inconsistent and unsupported by objective evidence; the handcuff claim is negated by objective and undisputed evidence; and the undisputed facts do not support the failure to intervene claim. Defendants also move to dismiss the claims for emotional injuries as insufficiently pleaded. (D.I. 140). Plaintiff opposes on the grounds that there remain genuine issues of material facts on whether Defendants' conduct was reasonable. (D.I. 145).

## III.   FACTS PRESENTED BY THE PARTIES[1]

Rosser was identified as the suspected shooter at a July 13, 2014 late night shooting at Georgetown Village Apartments.  (D.I. 141 at 29).  Rosser was taken into custody around 12:45 a.m. on July 14, 2014, and detained at New Castle County Police Headquarters Turnkey. (D.I. 141 at 29; D.I. 145-1 at 3 ¶ 1, 5).  The Justice of the Peace Court issued a search warrant sought by Defendant New Castle County Police Detective Thomas Orzechowski ("Orzechowski") to obtain DNA and gunshot residue from Rosser.  (D.I. 141 at 57-65).

A approximately 5:00 a.m., Defendant Senior Corporal Thomas Donovan ("Donovan") reported for duty as the Turnkey officer.  (D.I. 141 at 19, 21).  At approximately 5:40 a.m., Orzechowski and Defendants Detective John Mikus ("Mikus") and Officer Jeffrey Geortler ("Geortler) arrived at the cell block to execute the search warrant and, along with Donovan, went to the room where Rosser was being held.  (*Id*. at 21, 27, 29, 34).  Donovan unlocked and opened the door to the holding room.  (*Id*. at 21, 29).  Mikus was holding evidence collection vials and intended to enter the room.  (D.I. 141 at 29, 36).  Rosser states that he had never seen a gunshot residue kit and had never before had officers attempt to recover gunshot residue from him. (D.I. 145-1 at 3 ¶ 3).

Use of Force Reports state that Rosser stood at the doorway, stepped through the door towards Mikus, and came within approximately one foot of Mikus.  (*Id*. at 36).  According to Rosser, he asked why he was being detained and why he was under arrest.  (D.I. 141 at 111; D.I. 145-1 at 3 ¶ 2).  Rosser states that Defendants did not respond, and he repeatedly asked the question in a non-combative manner to several different officers while in custody.  (*Id*.). According to Mikus, he perceived Rosser's actions as physically threatening, and he told Rosser

---

[1]   The facts are construed in favor of Plaintiff, the non-moving party.

2

to sit down. (D.I. 141 at 36). Rosser did not comply and instead moved forward. (*Id*. at 29, 36, 43).

Mikus believed that Rosser was going to push him, and he stepped back and turned to put the evidence vials on the ground. (*Id.* at 36). According to Donovan, as Mikus stepped back, Donovan attempted to enter the room from the right side of the doorway and came face-to-face with Rosser. (*Id.* at 21). According to Orzechowski, Rosser was given an additional verbal order to back up, and Rosser did not comply. (*Id.* at 29). Donovan extended his arms outward to move Rosser back into the room, but Rosser pushed Donovan in the chest and attempted to leave the holding room. (*Id*. at 21, 29, 43). Rosser disputes that he pushed any officer. (D.I. 145-1 at 3 ¶ 4).

When he was deposed, Rosser testified that he could not remember what happened next although his affidavit filed in opposition to the motion for summary judgment provides some facts. (D.I. 141 at 113-120; D.I. 145-1 at 3-4). Use of Force Reports indicate that at this point Donovan grabbed Rosser by the shoulder/head area to bring him to the ground. (D.I. 141 at 21, 29, 36, 43). Geortler delivered a knee strike to the right knee to stop Rosser from resisting, but it was ineffective. (*Id*. at 43). Use of Force Reports state that Rosser resisted by lowering his bodyweight and getting into a crouching position. (*Id*. at 21, 29, 43). Donovan pulled Rosser in a downward motion out of the doorway, and both men fell to the ground and against a desk located outside of the holding room. (*Id.* at 21, 36, 43). The officers attempted to control Rosser's movements once he was on the ground. (*Id*. at 36, 41). Donovan repeatedly told Rosser to stop fighting, stop resisting, and to place his hands behind his back. (*Id*. at 21, 29). Mikus held Rosser's upper body with his hands, but Rosser attempted to get up. (*Id.* at 36). Donovan delivered several strikes with a closed fist to Rosser's upper body and head, but Rosser did not stop resisting and did not comply

with Donovan's verbal commands. (*Id*. at 21, 29, 36, 43). During this time, Mikus delivered several strikes to Rosser's abdomen/ribcage while Rosser continued to fight and physically resist. (*Id*. at 36). Rosser's affidavit states that he did not take an aggressive stance, did not take aggressive steps towards officers, and did not physically resist officers at any point while in custody. (D.I. 145-1 at 3 ¶ 5).

While attempting to subdue Rosser, Mikus was given a set of handcuffs and secured half the set on Rosser's right wrist. (D.I. 141 at 36). To do so, Mikus had to forcefully pull the handcuffs to cuff Rosser's right arm behind his back, Rosser continued to forcefully pull back, and Mikus saw the right handcuff tighten on the right wrist. (*Id*. at 36, 43). During this time, Orzechowski struggled to get control of Rosser's left hand to cuff it behind Rosser's back. (*Id*. at 29). Rosser scratched at Orzechowski and broke the skin on his hands. (*Id*.). The officers were eventually able to force Rosser's free hand behind his back, and Mikus secured and handcuffed Rosser's left wrist. (*Id*. at 29, 36). Rosser's legs were shackled. (*Id*. at 29).

Use of Force Reports indicate that Rosser continued to resist after he was cuffed and shackled and did not comply with commands to stop resisting, stop fighting, and to calm down. (*Id*. at 21, 29, 43). At this time Rosser was placed on his stomach and Orzechowski placed a knee on Rosser's back in attempt to control him. (*Id*. at 29-30). Rosser continued to try to scratch Orzechowski. Orzechowski told Rosser to stop, but Rosser did not. (*Id*. at 21, 30). Also during this time, Mikus held Rosser's handcuffed wrists, and Rosser clawed at and ripped Mikus' latex gloves. (*Id*. at 36). Rosser's affidavit states that the handcuffs were extremely tight, and Mikus recognized they were too tight, but he did not adjust and double lock them. (D.I. 145-1 at 3 ¶ 7). His affidavit also states that he was punched in the face multiple times by Donovan, kneed and

4

punched by Mikus, kneed by Geortler, and held down with knees to his back by Orzechowski. (*Id*. ¶ 6).

Next, Orzechowski heard Rosser prepare to spit. (D.I. 141 at 30). As described by Orzechowski, Rosser turned his head towards Donovan and spat a red substance in Donovan's direction. (*Id.* 30). During his deposition Rosser denied that he spat at Donovan and explained that Donovan was holding his head, he did not warn the officers before spitting, Donovan was on his left, and he spat towards the left, the spit did not go far and landed on the floor. (*Id*. at 121-123, 178). Donovan turned Rosser's head away from the officers to face the wall and held his head in that position until Geortler placed a spit sock on Rosser's head. (*Id.* at 21, 30, 43). Rosser was held in this position until the ambulance arrived. (*Id.* at 30).

When Rosser was placed on the stretcher he complained that the handcuffs were too tight. (*Id*. at 125). According to Rosser, he cried out in agony and pleaded with multiple officers in an attempt to have the cuffs loosened as they were causing him pain. (D.I. 145-1 at 3 ¶ 9). The Use of Force Reports states that Donovan checked the handcuffs, found them to be a little tight, loosened them and then double locked them. (D.I. 141 at 21). They also state that Geortler properly fit Rosser's handcuffs and double locked them once Rosser was secure in the ambulance. (*Id*. at 43).

Defendants Officer Timothy Collins ("Collins") and Detective Eric Christopher ("Christopher") accompanied Rosser to Christiana Care Hospital and remained with him until they returned to police headquarters. (*Id.* at 57). Neither were present during the use of force. (*Id*. at 49, 57). Rosser states that at the hospital he was afraid to tell emergency room physicians what happened because he had been threatened by an unnamed New Castle County officer whom he could not described. (D.I. 141 at 131; D.I. 145-1 at 3 ¶ 11.1). Medical records indicate that at the

hospital Rosser was personally interviewed and examined. (D.I. 141 at 210). Rosser's handcuffs were not removed because the officers were concerned about staff safety. (*Id.* at 211). Photographs taken at the hospital indicate that the spit hood was removed. (*Id*. at 199-201). Upon examination Rosser was observed as having swelling and bruising of the right orbit, swelling and a small laceration of the lip, and dried blood at the left nostril. (*Id*. at 210-211). Rosser "declined TdaP booster. [D]enies blood at back of throat, does not want to open mouth wide with use of tongue depressor for exam." (*Id*.). Clinical impression was epistaxis[2] and contusion/ecchymosis.[3] (*Id*.).

Eleven photographs were taken of Rosser after the incident: seven while he was at Christiana Hospital and four when he returned to the police station. (*Id*. at 198-209). Photographs taken after Rosser was released from the hospital showed cuts to both wrists as a result of Rosser rolling on the handcuffs before they were double locked. (*Id*. at 43). Two of the photographs show a person's finger in-between the metal of the handcuff and each of Rosser's wrist. (*Id.* at 204, 205). During his deposition, Rosser stated that that the photographs were accurate. (*Id*. at 136-137). Contrary to the Use of Force reports that indicate the handcuffs were loosened and later properly fitted, Rosser testified the handcuffs and leg cuffs were not loosened from the time they were placed on him at the police station until the time they were taken off following his return from the hospital to the police station. (*Id*. at 136-137, 175-176).

Rosser testified that on July 14, 2014, when medical staff performed his intake at Howard R. Young Correction Institution ("HRYCI") he lied to the staff when he said a bruise on his face

---

[2]   Hemorrhage from the nose; nosebleed. *See* https://www.tabers.com/tabersonline/view/Tabers-Dictionary/733132/all/epistaxis  (last visited Sept. 30, 2020).

[3]   Common bruise.  *See* https://www.healthline.com/health/ecchymosis (last visited Sept 30, 2020).

6

was from a fight the previous day. (*Id*. at 142). In his affidavit, Rosser states that he disclosed his injuries to physicians at HRYCI and was told there was nothing they could do to help. (D.I. 145-1 at 3 ¶ 12.1). On July 14, 2014, Rosser was cleared for housing in segregation. (D.I. 141 at 248). The next day, July 15, 2014, Rosser was admitted to the infirmary for medical observation due to right eye swelling. (*Id*.). Medical examination on July 16, 2014 revealed left suborbital swelling, minor healed facial skin abrasions, and no other lesions or findings noticed. (*Id*.). Rosser denied pain. (*Id*.). The same day, medical noted that Rosser was "OK to stay 'in the hole.'" (*Id*.). When Rosser was seen on October 25, 2014, following a Code 8 (*i.e*., fight between inmates) he denied pain and no injuries were noted. (*Id*.).

Rosser testified the next medical treatment he received related to the July 2014 incident was on May 20, 2016. (*Id*. at 166-168). At that time, he provided a history of neck, lower back, and finger tingling sensation and numbness that start from the neck and continue to his fingers and from his lower back radiating to his left calf, all of which affect his daily activities. (*Id*. at 238). He reported that the sensational changes and pain started two years ago when he was arrested, that he did not have these sensations prior to his arrest, and that he has taken over the counter medication but it has no affect. (*Id*.). On May 26, 2016, Rosser was assessed as having transient neuralgia vs. spasm. (*Id*.). When Plaintiff was seen on July 14, 2016, he complained of back, leg, ankle, and neck pain. (*Id*. at 235). Upon examination he had full range of motion to his neck, neuro checks were within normal limits, and bilateral strength was strong and equal. (*Id*.).

According to Rosser, as a result of the force used, he reinjured his lower back, and he suffered a bloody nose, black eye, swollen face, busted lip, and was emotionally distraught. (D.I. 145-1 at 3 ¶ 8). Rosser states that he has scars on his wrist from the handcuffs, now suffers from numbness in his hand with a tingling sensation, and his hands lock up so he is unable to

perform everyday tasks.  (*Id*. ¶ 10). Following the July 14, 2014 incident Rosser was charged with resisting arrest and offensive touching of a law enforcement officer.  (D.I. 141-1 at 51).  He was acquitted of the charges.  (D.I. 146 at 4 ¶ 2).

## IV.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party, and a factual dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

The nonmoving party bears the burden to establish the existence of each element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In doing so, the non-moving party must present specific evidence from which a reasonable fact finder could conclude in his favor. *Anderson*, 477 U.S. at 248; *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Summary judgment should be granted if no reasonable trier of fact could find for the non-moving party. *Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir. 1989).

## V.   DISCUSSION

### A.   Personal Involvement

This Court first addresses the issue of personal involvement.  There is no record evidence that Christopher or Collins had any personal involvement during the events complained of by

Rosser. The record evidence is that these Defendants escorted Rosser to the hospital, but were not involved in any use of force or in failing to prevent any use of force.

It is well established that a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 08 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Such allegations, however, must be made with appropriate particularity. *Id.*

Even when construing the evidence in the light most favorable to Rosser, no reasonable jury could find that Defendants Christopher and Collins were personally involved in the events as alleged by Rosser. As previously noted, these Defendants were either not present or arrived after the events in question and were tasked with escorting Rosser to the hospital. Absent evidence of their personal involvement, no jury could grant a verdict in favor of Rosser and against Christopher and Collins.

Accordingly, because they had no personal involvement, this Court will grant the motion for summary judgment as to Christopher and Collins.

### B. Excessive Force

The remaining Defendants – Donovan, Mikus, Orzechowski, and Geortler – move for summary judgment on the grounds that the actions they took were reasonable under the circumstances and as such they are protected by qualified immunity. Rosser argues that Defendants are not entitled to qualified immunity and contends the issue should be resolved by a jury.

9

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). "[A] pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398; *see also Aruanno v. Maurice*, 790 F. App'x 431 (3d Cir 2019). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable. *Kingsley*, 576 U.S. at 396-97. The reasonableness of the force used is determined by the *Kingsley* factors: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 397 (citing *Graham*, 490 U.S. at 396). The list is not exhaustive, but the *Kingsley* factors provide a guide for types of objective circumstances that are "potentially relevant to a determination of excessive force." *Id.*

Given the events occurred during the execution of a search warrant, were this Court to analyze the issue under the Fourth Amendment, this Court would also be required to determine whether Defendants' actions were objectively reasonable. "In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cty. v. Rettele*, 550 U.S. 609, 614 (2007) (citations omitted). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397; *Kopec*

10

*v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004); *Mosley v. Wilson*, 102 F.3d 85, 95 (3d Cir. 1996). The reasonableness factors under the Fourth Amendment are the same as those under the Due Process clause for pretrial detainee claims. *See Graham*, 490 U.S. at 396. A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time. *Rettele*, 550 U.S. at 614 (citations omitted).

A court cannot apply the reasonableness standard mechanically. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). Rather, objective reasonableness turns on the "facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *See ibid*. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979).

It is undisputed that Rosser was arrested and held as the suspect of a serious and violent crime. The record evidence is that Rosser was placed in a holding room and there is no evidence that he was otherwise handcuffed or restrained in any manner. Defendants appeared at the holding room to execute a search warrant. The record reflects that Rosser complied with all commands until confronted by Mikus with vials to collect Rosser's DNA and obtain gunshot residue from Rosser. At that point Rosser concedes that he refused repeated commands to back away from the door and to sit down. Although Rosser states that he did not know that the vials Mikus had were

to collect evidence, it is undisputed that once Mikus arrived Rosser failed to follow the commands of the officers present. It is also undisputed that Mikus perceived Rosser's actions as physically threatening and that he believed Rosser was going to push him. It was at this point that Defendants took action to restrain Plaintiff. The Use of Force Reports prepared contemporaneously with the events of July 14, 2016 describe in detail the altercation between Defendants and Rosser and indicate that Rosser resisted Defendants' attempts to subdue him. After he was subdued, Rosser spat in Donovan's direction. When Rosser was deposed he was unable to remember what happened once he decided he did not need to back away from the door or sit down, although his later filed affidavit disputes that he took an aggressive stance or steps toward any officer or physically resisted officers at any point.

Rosser claims that he was handcuffed too tightly and this caused him pain and injury. He complained that the handcuffs were tight and that the handcuffs were never loosened. Photographs show there was sufficient room to place the little finger between the handcuffs and Rosser's wrist. *See e.g.*, *Graham-Smith v. Wilkes-Barre Police Dep't*, 739 F. App'x 727 (3d Cir. 2018) (affirming lower court's decision approving handcuff "pinky test," looking at the totality of circumstances, and noting no record evidence that tight handcuffs caused injury beyond superficial lacerations). A Use of Force Reports indicate that photographs showed injuries to Rosser that were cuts to both wrists.

Rosser was taken to the hospital and medical records indicate that examination revealed a bruised and swollen right eye, a bloody nose, and a swollen lip with a slight cut. By the time Rosser arrived at the hospital he was not bleeding. Medical records do not make any mention of an injury to Rosser's wrists or that Rosser complained of wrist pain. In addition, Rosser was seen by prison medical personnel on July 14 and 15, 2014, and those medical records refer only to a

slightly swollen right cheek bone, and eye swelling with no mention of wrist injuries or wrist pain. As of July 16, 2014, Rosser denied pain and examination revealed mild left suborbital swelling and minor healed facial skins abrasions, with no other lesions or findings noticed, including no mention of injuries to his wrists. When Rosser was seen by medical on October 15, 2014, after a fight with another inmate, he denied pain and no injuries were noted. It was not until two years later, on May 20, 2016, that Rosser sought treatment related to the incident for injuries to his neck, lower, back, and tingling sensations in his finger and left calf, injuries about which he had not before complained. This Court notes that when Rosser was seen on July 14, 2016, again with complaints of back, leg, ankle, and neck pain, upon examination Rosser had full range of motion to his neck, neuro checks were within normal limits, and bilateral strength was strong and equal. The injuries as described in the medical records, and particularly those that are contemporaneous with the events of July 14, 2014, however, can only be described as de minimus, and do not indicate that Rosser was subjected to excessive force.

In applying the *Kingsley* factors, this Court finds that the force of used was objectively reasonable. As to the relationship between the need for the use of force and the amount of force used, Rosser admits that he refused commands to back away from the door and to sit down; as to the extent of his injury, the record reflects that any injuries were de minimus; as to any effort made by officers to temper or to limit the amount of force, the record reflects that Rosser refused commands to stop fighting, stop resisting, place his hands behind his back, and to calm down; as to the severity of the security problem at issue, the record reflects that Rosser was in a holding room but otherwise unsecured; as to the threat reasonably perceived, Marcus believed that Rosser's actions were physically threatening and that Rosser was going to push him; and as to whether Rosser was actively resisting, the contemporaneous Use of Force Reports indicate that he was,

although Rosser testified that he could not remember what happened after he refused commands to back away from the door, and his later filed affidavit states that he did not resist. Keeping in mind that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation," this Court concludes that the force used by Defendants was objectively reasonable to gain control of the situation. *See Graham*, 490 U.S. at 396-397.

For the above reasons, the Court finds that any force that may have been applied does not rise to the level of a constitutional violation. Therefore, the Court will grant Defendants' motion for summary judgment on the excessive force claim.

### C. Failure to Intervene/Failure to Protect

Finally, Defendants move for summary judgment on the failure to intervene/protect issue raised by Rosser. Rosser did not address the issue in his reply brief and it is considered waived. Regardless, as discussed above, summary judgment will be granted for Defendants on the excessive force issue and, without an underlying finding of the excessive use of force, there can be no claim for failure to intervene or protect. *See Nifas v. Coleman*, 528 F. App'x 132 (3d Cir. June 2013); *Wardell v. City of Erie*, 2015 WL 6134014 (W.D. Pa. Oct. 16, 2015) ("If there is no excessive force, then there is no corresponding duty to intervene.").

As previously discussed, the use of force was objectively reasonable under the circumstances. Hence, Defendants had no duty to intervene or protect. Therefore, the Court will grant the motion for summary judgment on the failure to intervene/protect claim.

## VI. <u>CONCLUSION</u>

For the above reasons, the Court will grant Defendants' motion for summary judgment (D.I. 138). An appropriate order will be entered.